**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JANE DOE (A.N.S.) an individual,<br><br>Plaintiff,<br><br>v.<br><br>WYNDHAM HOTELS & RESORTS, INC.;<br>DAYS INNS WORLDWIDE, INC.;<br>NANIATMA LLC; RJR INVESTMENT<br>LLC; GITA HOSPITALITY LLC; AMBE<br>MAA INC; MICROTEL INNS AND<br>SUITES FRANCHISING, INC.; and<br>SHREE RAMA INC.,<br><br>Defendants. | CIVIL ACTION NO: 2:24-cv-06618-CCC-AME |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff Jane Doe (A.N.S.) files this First Amended Complaint against WYNDHAM HOTELS & RESORTS, INC.; DAYS INNS WORLDWIDE, INC.; NANIATMA LLC; RJR INVESTMENT LLC; GITA HOSPITALITY LLC; AMBE MAA INC; MICROTEL INNS AND SUITES FRANCHISING, INC.; and SHREE RAMA INC., as Defendants and respectfully shows the Court as follows:

**SUMMARY**

1.     Jane Doe (A.N.S.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured at Days Inn and Microtel Inn & Suites hotels owned, operated, maintained, and controlled by Defendants and their agents and employees.

2.     Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or

1

coercion.[1] To "harbor" means to "give shelter or refuge to."[2] Traffickers or 'pimps', who use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will, often use hotels to harbor their victims.

3.      Some victims are brought into trafficking through abduction or use of physical violence, while many other trafficking relationships begin with a false promise of a romantic relationship or financial security.[3] Traffickers often prey on individuals with vulnerabilities that make them more susceptible to coercion and control.[4]

4.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

5.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

6.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.

[2] *Doe v. Hotels*, 6:23-CV-1012, 2024 WL 2955728, at *6 (M.D. Fla. June 12, 2024) (quoting Merriam-Webster Dictionary).

[3] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking

[4] Polaris Project, Sex Trafficking: The Basics, https://polarisproject.org/understanding-human-trafficking/

2

7.    As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (A.N.S.), with minimal risk of detection or interruption. Defendants continued supporting traffickers, including Jane Doe (A.N.S.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking in these hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

**PARTIES**

8.    Plaintiff Jane Doe (A.N.S.) is a resident of South Carolina. She may be contacted through her lead counsel, whose information is contained below.

9.    Jane Doe (A.N.S.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of causing her, through force, fraud or coercion, to commit a commercial sex act.

10.    The trafficking of Jane Doe (A.N.S.) occurred in or affected interstate commerce.

11.    Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (A.N.S.).

12.    Wyndham Hotels & Resorts, Inc. is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. Defendant Wyndham Hotels and Resorts, Inc. may be served through its registered agent for service Corporate Creations Network Inc. at 3411 Silverside Road, Rodney Building #104, Wilmington, Delaware 19810.

13.    All references to Wyndham Hotels and Resorts, Inc. include any department, division, office, agency, subsidiary, corporate affiliate, predecessor corporation, or successor corporation, whether domestic, foreign, and/or international. The term also includes any director,

3

officer, agent (either with direct/actual authority or implied/apparent authority), employee, person, firm, or corporation acting on behalf of Wyndham Hotels and Resorts, Inc. now or at any time relevant to the claims herein.

14.     Days Inns Worldwide, Inc. is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. Defendant Days Inns Worldwide, Inc. may be served through its registered agent for service Corporate Creations Network Inc. at 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803.

15.     All references to Days Inns Worldwide, Inc. include any department, division, office, agency, subsidiary, corporate affiliate, predecessor corporation, or successor corporation, whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority or implied/apparent authority), employee, person, firm, or corporation acting on behalf of Days Inns Worldwide, Inc. now or at any time relevant to the claims herein.

16.     Microtel Inns and Suites Franchising, Inc. is a for-profit Georgia corporation with its principal place of business in Parsippany, New Jersey. Defendant Microtel Inns and Suites Franchising, Inc may be served through its registered agent for service Corporate Creations Network Inc. at 2985 Gordy Parkway, 1st Floor, Marietta, Georgia 30006.

17.     Wyndham Hotels & Resorts, Inc., Days Inns Worldwide, Inc., and Microtel Inns and Suites Franchising, Inc. will be referred to as "Wyndham," "Wyndham Defendants" or "Franchisor Defendants." Upon information and belief, the Wyndham Defendants owned, operated, controlled, and/or managed the following hotels where Jane Doe (A.N.S.) was trafficked, which are referred to collectively as "the subject Wyndham locations":

> a. Days Inn & Suites located at 1144 Bush River Rd, Columbia, South Carolina 29210 ("Bush River Days Inn");

4

b. Days Inn & Suites located at 110 Branch Road, West Columbia, South Carolina 29168 ("Branch Road Days Inn");

c. Days Inn & Suites, located at 7300 Garners Ferry Rd, Columbia, South Carolina 29209 ("Garners Ferry Days Inn");

d. Days Inn located at 133 Plumbers Rd, Columbia, South Carolina 29203 ("Plumbers Rd Days Inn"); and

e. Microtel Inn & Suites . located at 1520 Barbara Dr, Columbia, South Carolina 29223 ("Barbara Dr Microtel Inn").

18.    Naniatma LLC is a for-profit South Carolina limited liability company with its principal place of business in Columbia, South Carolina. Naniatma LLC may be served through its registered agent for service Audhir Modi at 1144 Bush River Rd, Columbia, South Carolina 29210. At all relevant times, Defendant Naniatma LLC owned the Bush River Days Inn. Naniatma LLC, will be referred to as "Naniatma" and as a "Franchisee Defendant."

19.    RJR Investment LLC is a for-profit South Carolina limited liability company with its principal place of business in West Columbia, South Carolina. Defendant RJR Investment LLC may be served through its registered agent for service Jatin Shah at 110 Branch Rd, West Columbia, South Carolina 29210. At all times relevant, Defendant RJR Investment LLC owned the Branch Road Days Inn. RJR Investment LLC, will be referred to as "RJR" and as a "Franchisee Defendant."

20.    GITA Hospitality LLC is a for-profit South Carolina limited liability company with its principal place of business in Newton, Iowa. Defendant GITA Hospitality LLC may be served through its registered agent for service Anil Parag at 418 Aiken Hunt Circle, Columbia, South Carolina 29229. At all times relevant, Defendant GITA Hospitality LLC owned the Garners Ferry Days Inn. GITA Hospitality LLC, will be referred to as "GITA" and as a "Franchisee Defendant."

21.    AMBE MAA Inc. is a for-profit corporation South Carolina with its principal place of business in Union, South Carolina. Defendant AMBE MAA Inc. may be served through its

5

registered agent for service Praful Patel at 133 Plumbers Rd, Columbia, South Carolina 29203. At all times relevant, Defendant AMBE MAA Inc owned the Plumbers Rd Days Inn. AMBE MAA Inc., will be referred to as "AMBE MAA" and as a "Franchisee Defendant."

22.    Shree Rama Inc. is a for-profit corporation South Carolina corporation with its principal place of business in Union, South Carolina. Defendant Shree Rama Inc may be served through its registered agent for service Suresh Topiwala at 215 Autumn Woods Dr, Irmo, South Carolina 29063. At all times relevant, Defendant Shree Rama Inc owned the Barbara Dr Microtel Inn. Shree Rama Inc, will be referred to as "Shree Rama" and as a "Franchisee Defendant."

23.    Naniatma, RJR, GITA, AMBE MAA, and Shree Rama are referred to collectively as "Franchisee Defendants."

**JURISDICTION AND VENUE**

24.    This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

25.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district and all Defendants are residents of New Jersey for purpose of venue under 28 U.S.C. §§ 1391(c).

26.    Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the District of New Jersey.

27.    All Wyndham Defendants have the same principal place of business, which is in Parsippany, New Jersey, within the District of New Jeresy. Corporate activities related to the operation of each of the subject Wyndham locations occurred at this New Jersey headquarters, and documents related to each of the subject Wyndham locations are stored and maintained at this New Jersey headquarters.

6

28.    Plaintiff's claims against of the Franchisee Defendants arise out of each Franchisee Defendant's contacts with New Jersey through it franchising relationship with the Wyndham Defendants. These franchising relationships were centered at the Wyndham Defendants' principal place of business in the District of New Jersey. Each of the Franchisee Defendant's participation in a venture with the Wyndham Defendants operating its respective hotel occurred, in substantial part, in New Jersey. For example:

a.    Upon information and belief, each Franchisee Defendant actively sought out a franchising relationship by contacting the Wyndham Defendants in New Jersey.

b.    The franchising agreement had a choice of law provision selecting the law of New Jersey as the governing law.

c.    Each Franchisee Defendant agreed to resolve all disputes with the Wyndham Defendants by mediation, arbitration and/or litigation in New Jersey.

d.    Each Franchisee Defendant agreed to submit all notices required under the franchising agreement to the Wyndham Defendants in New Jersey.

e.    The Wyndham Defendants dictated rules and policies related to operation of the subject Wyndham locations, including those related to safety, security, human trafficking, employee training and response, from their principal place of business in New Jersey.

f.    Each Franchisee Defendant was required to submit regular reports regarding financial performance, guest satisfaction, and operational matters to the Wyndham Defendants' corporate offices in New Jersey.

g.    The rules and policies that the Wyndham Defendants adopted required each Franchisee Defendant to report information to their headquarters in New Jersey, including information about all incidents involving safety, security, public relations, or serious injury to persons or property that occur at, or involve, the subject Wyndham locations, including those involving sex trafficking victims like Jane Doe (A.N.S.).

h.    Each Franchisee Defendant had an ongoing obligation to participate in centralized programs operated by the Wyndham Defendants from their principal place of business in New Jersey.

i.    Each Franchisee Defendant utilized centralized customer feedback and complaint resolution system managed by the Wyndham Defendants from New Jersey, and the

7

Wyndham Defendants and each Franchisee Defendant coordinated efforts to analyze and respond to guest feedback.

j. Each Franchisee Defendants' employees received training and operational guidelines from the Wyndham Defendants, with key training materials being developed and distributed from New Jersey, particularly in the areas of safety and anti-trafficking protocols.

k. Reservation information for rooms at the subject Wyndham locations passed through a system operated and managed by the Wyndham Defendants from their principal place of business in New Jersey.

l. Payment information for rooms at the subject Wyndham locations passed through a system operated and managed by the Wyndham Defendants in New Jersey.

m. The benefit that each Franchisee Defendant received from room rentals was governed by a New Jersey franchising agreement.

n. Each Franchisee Defendant agreed to make all payments due under the franchising agreement at the Wyndham Defendants' principal place of business in New Jersey.

o. Each Franchisee Defendant's operation of the subject Wyndham locations was controlled and/or influenced by many policies set and enforced by the Wyndham Defendants from their principal place of business in New Jersey.

p. Each Franchisee Defendant was required to purchase insurance for the New Jersey-based Wyndham entities related to operation of the subject Wyndham locations.

29. As a separate and additional remedy for those exploited as children, in 18 U.S.C. § 2255, Congress authorized any person who, while a minor, was a victim of a violation of 18 U.S.C. § 1591, to sue in any appropriate district court to recover damages. This provision authorizes nationwide service of process and nationwide jurisdiction. Because Jane Doe (A.N.S.) was trafficked as a minor, jurisdiction in this Court is proper under § 2255 and each Defendant is thus a resident of New Jersey for the purpose of venue.

8

**STATEMENT OF FACTS**

I.     **Jane Doe (A.N.S.) was a Victim of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed and Controlled by Defendants.**

30.     Jane Doe (A.N.S.)'s trafficker used force and coercion to cause her to engage in numerous commercial sex acts, including while she was a minor.  Her trafficker first established control over her by luring her, while she was still a vulnerable child, with a romantic relationship and making fraudulent promises. He then used this control to force her to engage in commercial sex. He set a strict quota for how much money Jane Doe (A.N.S.) was required to earn. When she resisted his demands or failed to earn enough money, he turned abusive, beating her and threatening her. He carried a gun and used that weapon to threaten Jane Doe (A.N.S) and her family. He would deprive Jane Doe (A.N.S.) of food and would not allow her to rest until she made enough money. Jane Doe (A.N.S.) was trafficked continuously between June 1, 2014 and December 31, 2016.

31.     Jane Doe (A.N.S.)'s trafficking repeatedly occurred in the rooms of each of the subject Wyndham locations and was facilitated by the Wyndham Defendants and each of the Franchisee Defendants. The trafficker of Jane Doe (A.N.S.) and other sex traffickers frequently used the subject Wyndham locations for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents, including the staff of each of the subject Wyndham locations.

32.     Jane Doe (A.N.S.)'s trafficker selected hotels that were known to be favorable locations for trafficking and other illegal activity, where hotel staff were known to turn a blind eye to illegal activity, and where hotel policies and procedures made it easier to operate with minimal risk of detection or interference. He chose to operate at each of the subject Wyndham locations because they were were favorable venues for trafficking.

9

33.     Jane Doe (A.N.S.) was repeatedly trafficked at the Bush River Days Inn, including on multiple occasions during 2016. Her trafficker repeatedly brought her to this hotel to require her to engage in commercial sex for his financial benefit, sometimes keeping her there for weeks at a time.

34.     At all relevant times, Naniatma provided the "boots on the ground" and employed the staff at the Bush River Days Inn.

35.     Jane Doe (A.N.S.) was repeatedly trafficked at the Branch Road Days Inn, including for a period of several weeks in 2014. Her trafficker repeatedly brought her to this hotel to require her to engage in commercial sex for his financial benefit.

36.     At all relevant times, RJR provided the "boots on the ground" and employed the staff at the Branch Road Days Inn.

37.     Jane Doe (A.N.S.) was trafficked at the Garners Ferry Days Inn, including in 2015. Her trafficker brought her to this hotel to require her to engage in commercial sex for his financial benefit and kept her there for weeks.

38.     At all relevant times, GITA provided the "boots on the ground" and employed the staff at the Garners Ferry Days Inn.

39.     Jane Doe (A.N.S.) was trafficked at the Plumbers Rd Days Inn on numerous occasions in 2014 and 2015. Her trafficker repeatedly brought her to this hotel to force her to engage in commercial sex, often keeping her there for several days at a time.

40.     At all relevant times, AMBE MAA provided the "boots on the ground" and employed the staff at the Plumbers Rd Days Inn.

41.     Jane Doe (A.N.S.) was trafficked at the Barbara Rd Microtel Inn for a period of approximately five months in 2015. Her trafficker kept her at this hotel and required her to engage in commercial sex for his financial benefit on innumerable occasions.

42.     At all relevant times, Shree Rama provided the "boots on the ground" and employed the staff at the Barbara Rd Microtel Inn.

43.     At all relevant times, the Wyndham Defendants were directly involved in the relevant operations of each of the subject Wyndham locations and exercised systemic control over each of the Franchisee Defendants such that each of the Franchisee Defendants were the Wyndham Defendants' actual agents for operation of the subject Wyndham locations. The Wyndham Defendants also retained control over aspects of the operations of the subject Wyndham locations directly related to the claims of Jane Doe (A.N.S.)

II.     **The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.**

44.     While the widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Wyndham Defendants knew or should have known regarding the trafficking at their hotel properties, trafficking activity, including that of Jane Doe (A.N.S.), was pervasive and apparent at the subject Wyndham locations.

45.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[5] For years, sex traffickers have "been able to reap enormous profits with little risk when attempting to operate within hotels."[6] In 2014, 92 percent of calls to the Human

---

[5] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id*

[6] *See Human Trafficking in the Hotel Industry*, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

11

Trafficking Hotline involved reports of sex trafficking taking place at hotels.[7] Hotels have been found to account for over 90 percent of commercial exploitation of children.[8]

46. Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[9]

47. Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[10] This resulted in the development of "red flags" of sex trafficking. Law enforcement agencies and other organizations with subject-matter expertise identified specific indicators of the presence of sex trafficking at a hotel. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. From check-in to check-out, there are indicators that traffickers and their victims routinely

---

[7] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[8] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[9] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

[10] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

12

exhibit during their stay at a hotel. These recurring indicators are known as "red flags" of sex trafficking.

48.    Recognized "red flags" of sex trafficking that are considered general indicators of trafficking that can be observed by staff throughout a hotel[11] include:

- individuals who appear to be with a significantly older "boyfriend" or in the company of much older males;
- a group of girls who appears to be traveling with an older female or male;
- a group with similar tattoos, which can indicate "branding" by a trafficker;
- individuals showing fear, anxiety, tension, submissiveness and/or nervousness;
- individuals who seem disoriented;
- individuals showing signs of physical abuse;
- individuals showing signs of restrain or confinement;
- individuals showing signs of malnourishment, poor hygiene, fatigue, or sleep deprivation;
- individuals with signs of untreated illness or injuries;
- individuals who appear to lack freedom of movement;
- individuals who are being constantly monitored and/or escorted around the hotel;
- individuals who avoid eye contact;
- individuals who avoid interactions with others;
- individuals who are not in possessions of their own identification;
- individuals who have few or no personal possessions;
- individuals who dress provocatively;
- a high volume of men who are not registered guests entering and exiting a room; and
- individuals who wait in common areas while other men frequent the room.

49.    Recognized "red flags" of sex trafficking that can be detected by front-desk staff and hotel security[12] include:

- patrons appeared distressed at check-in;
- the same person reserving multiple rooms;
- rooms paid for with cash or prepaid cards;
- rooms are paid for one day at a time;
- requests for isolated rooms or rooms close to an exit;
- use of hotel computers for adult oriented or sexually explicit websites;
- patrons not forthcoming about identifying information when registering;

---

[11] *See id.*
[12] *See id.*

13

- individuals checking in but then leaving a room only infrequently, not at all, or at odd hours;
- individuals lack identification;
- car in the parking lot is parked so license plate is not visible;
- individual present who avoids eye contact, does not communicate, and is accompanied by someone else who appears to speak for them; and
- individual appears to be giving scripted responses.

50.     Recognized "red flags" of sex trafficking that can be detected by housekeeping, maintenance, and room service staff[13] include:

- constant use of the "Do Not Disturb" sign;
- requests for housekeeping services (towels, linens, etc.) but denying staff entry into the room;
- refusal of cleaning services for multiple days;
- excessive amounts of cash in a room;
- presence of multiple computers, cell phones, pagers, or other technology;
- the same person reserving multiple rooms;
- individuals leaving the room infrequently, not at all, or at unusual hours;
- individuals loitering in hallways or appearing to monitor a room;
- excessive alcohol in a room;
- illegal drugs in a room;
- evidence of pornography;
- excessive number of people staying in a room;
- guests with few or no personal possessions in room;
- provocative clothing and shoes;
- constant flow of men into a room at all hours; and excessive amounts of sex paraphernalia in rooms.

51.     The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[14]  From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

---

[13] *See id.*
[14] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

14

52.     The organizations who developed these "red flags," then educated and trained the hotel industry about them. For example, the United States Department of Homeland Security's Blue Campaign initiative issued specific guidance to the United States hotel industry through a "Hospitality Toolkit" describing human trafficking warning signs that could be detected by various categories of hotel staff. [15]

53.     Before Jane Doe (A.N.S.)'s trafficking at the subject Wyndham locations, each Defendant was educated and trained on these "red flags" of sex trafficking. The organizations that developed these "red flags" identified them as indicators specific to sex trafficking in a hotel environment. At all relevant times, each Defendant acknowledged and recognized these "red flags" specifically as signs of sex trafficking and instructed and trained their staff to identify and investigate them as signs of sex trafficking when observed in the hotel.

54.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[16] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

55.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants

---

[15] / Department of Homeland Security, Blue Campaign Toolkit, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.; www.doj.state.wi.us/sites/default/files/ocvs/human%20trafficking/Hospitality%20Toolkit%20-%20English%20-%20Wisconsin%20AG%20Office%281%29.pdf

[16] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[17]

56.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

57.     The most effective weapon against sexual exploitation and human trafficking is education and training.[18]  As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[19]

58.     This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[20]   In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

59.     Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and

---

[17] *Id.*

[18] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

[19] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

[20] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

16

respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

60. Each of the Wyndham Defendants and Franchisee Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

61. Unfortunately for Jane Doe (A.N.S.), the Wyndham Defendants and Franchisee Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (A.N.S.).

**III.   Sex Trafficking Has Long Been Prevalent at Wyndham Branded Properties, and Defendants Have Known About It.**

62. Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (A.N.S.)'s trafficking, that sex trafficking was ongoing and widespread at Wyndham branded properties including the subject properties named herein.

**a.   Sex Trafficking at Wyndham Branded Hotels was well Known by Defendants**

63. Upon information and belief, each of the Defendants monitored criminal activity occurring at Wyndham branded hotels and were aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the subject Wyndham locations where Jane Doe (A.N.S.) was trafficked.

64. Upon information and belief, at all relevant times Wyndham has adopted a centralized approach to trafficking-related issues at all its branded properties. Wyndham's public

17

statements confirm that it knew sex trafficking was a problem at its hotels and that it retained control over the response of its branded hotels to sex trafficking. Wyndham has recognized it has a "critical role in increasing awareness and prevention" of sex trafficking in its hotels.[21] It has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[22] However, Wyndham has refused to publish reports to show its progress on the EPCAT goals to combat sex trafficking in hotels.[23]

65.    Unfortunately, while Wyndham's statements reflect actual knowledge of the problem of sex trafficking, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking. Emails among company executives reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[24]

66.    The problem of sex trafficking at Wyndham branded properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotels from supporting child sex exploitation at Wyndham properties. Although the Wyndham brand publicly committed to take steps to stop facilitating trafficking, this promise proved empty; the Wyndham brand has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[25]

---

[21] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/

[22] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/

[23] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2023

[24] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")

[25] https://endsexualexploitation.org/wyndham/

67.     In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[26]

68.     Information that has become public through news stories establishes the entrenched and pervasive nature of Wyndham hotels' role in providing a venue where sex trafficking has continued unabated for years. Upon information and belief, Wyndham Defendants and Franchisee Defendants monitored news stories and online reviews for indicia of criminal activity, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Wyndham branded hotels include:

- In 2010, a man was arrested on human trafficking charges, accused of forcing teens into prostitution at a Days Inn."[27]

- June 2011, a woman was sentenced to 9 years in prison for the sex trafficking of two 14-year-old girls. The girls were forced to work at the Days Inn in Hartford, Connecticut.[28]

- In 2012, federal officials caught and arrested a man alleged to have trafficked a 14-year-old girl at a Florida Days Inn.[29]

- In 2012, the first successful prosecution of a human trafficking case in Wisconsin occurred after a man trafficking a woman at a Days Inn in Wausau, Wisconsin.[30]

- In October 2012, a woman was arrested for prostitution an Ohio Days Inn. This arrest came after a 2011 prostitution sting operation that netted six arrests.[31]

---

[26] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/
[27] *Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution*, NOLA.com (Jul 20, 2010),
Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution | Crime/Police | nola.com
[28] *East Hartford Woman Sentenced to 9 Years In Prison for Sex Trafficking Of Two 14-Year-Old Girls*, Hartford Courant (June 24, 2011), https://www.courant.com/2011/06/24/east-hartford-woman-sentenced-to-9-years-in-prison-for-sex-trafficking-of-two-14-year-old-girls/.
[29] *Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14*, The Palm Beach Post (March 31, 2012) https://www.palmbeachpost.com/story/news/crime/2012/02/08/federal-officials-catch-arrest-man/7283405007/
[30] Shereen Siewert, *Sex-trafficking cases hard to crack in Wisconsin*, Post Crescent (March 25, 2014), https://www.postcrescent.com/story/news/2014/03/25/sex-trafficking-cases-hard-to-crack-in-wisconsin/6884671/.
[31] https://patch.com/ohio/lakewood-oh/woman-arrested-for-prostitution-at-days-inn

- A Days Inn owner in Pennsylvania was forced to pay 24 million dollars to teenage victims of sex trafficking who were exploited at the hotel in 2012 and 2013.[32]

- Three people were arrested in July 2014 in Fayetteville on human trafficking charges after holding a woman captive at a Days Inn.[33]

- In July 2014, three people were arrested and accused of kidnapping and torturing a woman for human trafficking out of a Days Inn in Orange County, CA.[34]

- In September 2014, two Nevada residents were arrested on sex trafficking charges. Officers set up surveillance at a Days Inn in Nashville and "it did not take long for officers to observe heavy foot traffic in and out of that hotel room consistent with a prostitution operation."[35]

- In 2015, a man was charged with trafficking teenage girls after being arrested at a Days Inn in Maryland.[36]

- In April 2015, a Philadelphia man was sentenced for sex trafficking minors. The man worked as a security guard at a Days Inn in Philadelphia and "provided protection and assistance to sex traffickers operating at the motel in exchange for a daily fee."[37]

- In June 2015, two Brooklyn men charged with sex trafficking allegedly forced a teenage girl into prostitution from a Long Island City Days Inn.[38]

- In 2017, arrests were made after it was discovered women were being trafficked out of another Days in Inn Tennessee.[39]

---

[32] https://northeasttimes.com/2019/04/02/roosevelt-inn-days-inn-named-in-sex-trafficking-lawsuits/

[33] Three arrested on human trafficking charges in NC, Fox8 (July 2, 2014), https://myfox8.com/news/three-arrested-on-human-trafficking-charges-in-nc/.

[34] Jeanne Kuang, Three Accused of Kidnapping, Torturing Woman for Human Trafficking in Orange County, NBC Los Angeles (July 30, 2014), https://www.nbclosangeles.com/news/three-accused-of-brutally-kidnapping-torturing-woman-for-human-trafficking-in-orange-county/65718/.

[35] Las Vegas Man, Woman Jailed on Prostitution Charges, City of Franklin, TN (Sept. 5, 2014), https://www.franklintn.gov/Home/Components/News/News/2563/.

[36] https://www.heraldmailmedia.com/story/news/local/2015/07/01/hagerstown-man-charged-with-trafficking-of-two-teenage-girls/45202521/

[37] Philadelphia Man Sentenced for Sex Trafficking Conspiracy, U.S. Attorney's Office (April 9, 2015), https://www.fbi.gov/contact-us/field-offices/philadelphia/news/press-releases/philadelphia-man-sentenced-for-sex-trafficking-conspiracy.

[38] Jackie Strawbridge, *Cuffed Brooklyn Men Allegedly Pimped At LIC Hotel*, licpost (June 9, 2015), https://licpost.com/cuffed-brooklyn-men-allegedly-pimped-at-lic-hotel.

[39] https://www.wgnsradio.com/article/35818/human-trafficking-case-in-murfreesboro

20

69.     These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Wyndham branded hotels. Moreover, on information and belief, the Wyndham Defendants are aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

70.     Based on information and belief, the Wyndham Defendants and Franchisee Defendants managed and monitored on-line reviews of Wyndham hotel locations. Examples of reviews reflecting indica of sex trafficking and related criminal activity include:

- A Booking.com review from September 29, 2021 states: "Negative: The cops pulled us over after we left the parking lot. They told us that this motel was known fir [sic] drugs and sex rings"[40]

- A Google.com review from 2018 states: "Problem I have is owner. He treats women very poorly and makes his underage children work there. A lot of prostitution that I'm sure owner aware of. I seen him talking to this guy that has checked in 3 different times with 3 different [sic]"[41]

- A Trip Advisor review from June 20, 2014 states: "I witnessed what seemed to be prostitution in and out of the hotel. A huge party went on "in the hallways" well into the night with full tilt hip hop music. The following morning I experienced a naked woman being attacked in the hallway and had to intervene when not one other hotel security, management came to help."[42]

- A June 2007 Tripadvisor review from a Days Inn in Fresno, CA states "…Which leads me to note the problems with this motel--its location. Because it's close to the 99, and gets a lot of quick travelers up and down the highway, it seems to be the neighborhood to find a prostitute. During our one day stay, we saw at least 4. In the DAYTIME!! And although we

---

[40] https://www.booking.com/hotel/us/days-inn-clarksville-tn.html

[41] https://www.google.com/travel/hotels/Days%20Inn%20127%20W%20Byers%20Ave,%20New%20Stanton,%20PA%2015672%20google/entity/CgoIiJGz_YeevpIDEAE/prices?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4926165,4926489,4931360,4936396,4937897,4940607,47061553&hl=en-US&gl=us&ssta=1&q=Days+Inn+127+W+Byers+Ave,+New+Stanton,+PA+15672+google&grf=EmMKLAgOEigSJnIkKiIKBwjnDxAEGBASBwjnDxAEGBEgADAeQMoCSgcI5w8QARgfCjMIDBIvEi2yASoSKAomCiQweDg4MzRkOTA1ZjM5OTA5YmQ6MHgzMjRmOGYwN2ZhY2M4ODg&rp=EIiRs_2Hnr6SAxCIkbP9h56-kgM4AkAASAHAAQI&ictx=1

[42] https://www.tripadvisor.com/Hotel_Review-g60097-d1571552-Reviews-Days_Inn_Suites_by_Wyndham_Milwaukee-Milwaukee_Wisconsin.html

weren't bothered by anyone, and the motel itself was quiet, if you've got a family you may want to skip this one."[43]

- A July 2007 Tripadvisor review from a Days Inn in Philadelphia, PA states "This was the worst place I've ever stayed in my life. I've stayed in a lot of Day's Inn that were clean, adequate rooms in a safe neighborhood. As we followed the directions we became apprehensive. When we entered the hotel lobby we knew we had made a mistake when we saw the "bullet proof glass"surrounding the front desk. With our arrival being 4th of July week we felt stuck knowing we could probably not find another room in town at 7 PM. We decided it was better to lock ourselves in a room there than to risk not finding a room elsewhere and having to spend the night in the car. I'll just say that after my one night stay here I'm not sure if I'll ever book Days Inn again! The carpet was soiled. The headboards that were supposed to be bolted to the wall was coming off. We checked out at first light assuming this would be the safest time of day to get out! Prostitutes were hanging around out front and coming in purchasing rooms. Definately not a place for a family!"[44]

- August 2008 Tripadvisor review from a Days Inn in Birmingham, AL states "Saw the website pictures and thought it looked nice and was a good value. So, I booked the room for a week. It was a mistake! It was dirty and had a lot of low life people staying there. Prostitutes, pot heads, and people wandering around all over the place. The pool was a "cess-pool". It stank, and there was a condom wrapper in it. I will NEVER stay there again"[45]

- November 2008 Expedia review from a Days Inn in Nanuet, NY states "The one thing that I will always remember about this hotel was that I had to call the front desk because a very loud and noisey pair of hookers decided to hang out in the hallway next to the exit door (which was unfortunately right near my room) while they waited for a ride to pick them up after their visit to the neighboring hotel room. They were loud and obnoxious after 10 pm while I and my family were trying to sleep. We were on a non-smoking floor and the hookers in the hallway were smoking. When we checked out the next morning we found the hallway littered with their half-eaten pizza slices and crumpled up paper cups. I had to call the front desk to complain about the noise. I don't know if it was a hotel employee or their ride who finally showed up and hustled the call-girls out of the hallway."[46]

---

[43] https://www.tripadvisor.com/Hotel_Review-g32414-d77021-Reviews-Days_Inn_by_Wyndham_Fresno_Central-Fresno_California.html
[44] https://www.tripadvisor.com/Hotel_Review-g60795-d96684-Reviews-or20-Days_Inn_by_Wyndham_Philadelphia_Roosevelt_Boulevard-Philadelphia_Pennsylvania.html
[45] https://www.tripadvisor.com/Hotel_Review-g30375-d73343-Reviews-Days_Inn_by_Wyndham_Birmingham_West-Birmingham_Alabama.html
[46] https://www.expedia.com/Nyack-Hotels-Days-Inn-By-Wyndham-Nanuet-Spring-Valley.h172075.Hotel-Reviews

22

- December 2008 Tripadvisor review of a Days Inn in Silver Spring, MD states "This was the worst hotel in my life!" "Both me an my friend are not weedy guys, but we felt unsafe staying there. At around 6pm some black guys kept hovering outside the room, then as it got later some other black guys pulled up in a car outside in the car park and where making lots of noise in there car... then other black guys would go up to the car, and then after a while walk off. Seemed like drug deals where going on in the car park! This is bad because the hotel has absolutely no (ZERO!) security. Members of the public can freely walk in and just go straight to the rooms. It felt very unsafe, so we instantly checked out and made a quick getaway! Later we found a motel 6 which was a little better but at least safer than this hotel. Other people from the area told us that if the locals notice any foreigners then we could be easy targets and they will watch us. Very unsafe. bullet proof glass in the reception, its basically like being in the bronx run down hotel. It seems that its a very cheap hotel, where the criminals, drug dealers, prostitutes use as its cheap. Dangerous for outsiders or foreigners to use. Not recommended at all. Avoid at all costs."[47]

- February 2009 Tripadvisor review of a Days Inn in Miami, FL states "…got to the hotel, which is in a seedy neighborhood. Walked into the lobby and there were six people in front of us trying to check in. There was a HOOKER working in the lobby. There was one person working plus a security guard. It was taking the receptionist 15 minutes to check in one person. We realized it would be an hour and a half to check in, we'd only get to sleep for 2.5 hours, so we got BACK in the shuttle and slept on the floor of the airport, it was that scary. Don't be fooled."[48]

- July 2010 Tripadvisor review of a Days Inn in Springfield, MO states "Hotel Staff was very friendly, but when we first went into the room there was trash under the bedskirt and a used condom laying by the night stand…Worst of all there were prostitutes staying down below us, I had to go notify staff, she comented that she wonder if that was why she was staying here and the day before we came back to the hotel from watching my son play ball and 2 women were being arrested on the stairs going up to our room. There were several homeless people hanging around the hotel for 3 of the days. I have stayed in Days Inn before and they were nice but I did not feel safe and the experience was bad so I am not sure I will stay again…"[49]

- August 2010 review from Days Inn in Norfolk, VA states "…There were many people drinking on the upper floor. We were told by a passerby that

[47] https://www.tripadvisor.co.za/Hotel_Review-g41378-d84007-Reviews-or260-Days_Inn_by_Wyndham_Silver_Spring-Silver_Spring_Montgomery_County_Maryland.html
[48] https://www.tripadvisor.com/Hotel_Review-g34443-d87080-Reviews-Days_Inn_by_Wyndham_Miami_Airport_North-Miami_Springs_Florida.html
[49] https://www.tripadvisor.com/Hotel_Review-g44926-d243908-Reviews-Days_Inn_Suites_by_Wyndham_Springfield_on_I_44-Springfield_Missouri.html

23

their son was offered services by prostitutes while on the premises. We left right away. Front desk staff said this hotel is safe but front desk staff will note even allow people to walk into the front desk lobby but rather communicate with people through a little hole on a confined space area about 4 x 7 room prior to entering the front desk lobby giving people a false sense of security. There were many people drinking on the upper floor and loitering. No security staff to enforce any rules. My family was frightened to stay at this inn."[50] The manager of this hotel responded to it on November 19, 2010.

- September 2010 review of a Days Inn in Milwaukee, WI states "…got back about midnight to find a pair of gentlemen bleeding in the main lobby, i later found out that they were there for a bachelor party and had found a couple "working girls" who took them out and then drugged and beat them, and the their pimp did some stuff i dont even want to repeat, regardless to say, i didnt spend the night, i left at about 3 am, checked into a hotel and absolutely would not recomment this hotel, staff and hotel are nice enough. but the manager and location are just not worth dealing with."[51]

- June 2011 Expedia review of a Days Inn in San Jose, CA states "NOT SAFE PLACE TO STAY OR BRING YOUR FAMILY. Nothing was clean, swimming pool was not usable, there were blood stains on the sheets, no customer service.~~Worst of all, there were drug deals there all the time as well I was propositioned for sex as someone thought I "worked there" Please do not stay here if you want to feel safe"[52]

- January 2012 review from a Days Inn in Lawndale, CA states "… it felt super unsafe lie kinda place that hookers, pimps, gens, & drug dealers frequent. … I would never stay here again. this place is a motel! worth only about $25 a night. its no good unless u just need four walls and bed to sleep in for a night."[53]

- March 2012 review from a Days Inn in New Stanton, PA states "…Sketchy men are inside their truck smoking and hanging out in the parking lot. Men start ogling me and eying me in a creepy, sketchy way and my coach and her husband (both are cops) make a comment about a young woman who is scantly clad and walking with a man in his sixties arm in arm. The son makes a comment that a business transaction was going on and this was a prostitute and a john!" "So, I know that they got rid of my room, because

---

[50] https://www.tripadvisor.com/Hotel_Review-g58026-d110777-Reviews-Days_Inn_by_Wyndham_Norfolk_Military_Circle-Norfolk_Virginia.html
[51] https://www.tripadvisor.com/Hotel_Review-g60097-d1571552-Reviews-Days_Inn_Suites_by_Wyndham_Milwaukee-Milwaukee_Wisconsin.html
[52] https://www.expedia.com/San-Jose-Hotels-Days-Inn-By-Wyndham-San-Jose.h18108.Hotel-Reviews
[53] https://www.tripadvisor.ca/Hotel_Review-g32612-d84227-Reviews-Days_Inn_by_Wyndham_Los_Angeles_Lax_Redondo_ManhattanBeach-Lawndale_California.html

24

they would rather charge a desperate pervert a higher rate so that he could pay for sex, then an athlete with a lower rate. I argue with the two people at the front desk and get into a shouting match and then five sketchy men stand right near the front desk staring there even after he said that the hotel was booked full…"[54]

- June 2012 review from Das Inn in Atlantic City, NJ states "…when I came back to my hotel I was greeted by to atlantic city prostitutes walking out of the lobby with the european looking fellow. At the lobby the hotel has a $10 per guest policy I suppose as a way of making commissions. Lol. Uuuugh.for the price I paid I should have expected as much and not been as naive but I won't be making that mistake again."[55]

- October 2012 Yelp review of a Days Inn in Sarasota, FL states "Great hotel - if you enjoy being propositioned by prostitutes. Skid row's "finest." A real DUMP."[56]

- January 2013 review from Days Inn in Copiague, NY states "I would not wish this place on my worst enemy. The room smelled like a dead body and they tried to cover it up with Lysol. I let them know that I tried to air the room out for 20 minutes and it did not help. They moved me to the room next door and it was the same thing.
There were all kinds of ghetto trash hanging around my car when I was leaving and the place seemed like a party/hooker hotel based on the people hanging around there."[57]

- January 2013 review of Days Inn in Miami, FL states "Our television didn't work, the walls and tub had stains all over them, and there were hookers and their pimp hanging out waiting for johns on the top floor of the outside rooms overlooking the parking lot. When we complained it was obvious that some of the staff obviously knew what was going on with the prostitution. However the staff we dealt with did try to accomodate us by giving us another room on the inside of the hotel, but it was still filthy."[58] A guest relations manager responded to this review on February 4, 2013.

- March 2013 review of a Days Inn in Monroeville, PA states "jenny calderlore (manager) u are failing at making this hotel a success ur neglect and lack of responsibility has turnd me and buisness partners off we will never use this shack again we areas more then the twobit nite people

---

[54] https://www.yelp.com/biz/days-inn-by-wyndham-new-stanton-pa-new-stanton
[55] https://www.yelp.com/biz/days-inn-by-wyndham-atlantic-city-oceanfront-boardwalk-atlantic-city
[56] https://www.yelp.com/biz/days-inn-by-wyndham-sarasota-bay-sarasota
[57] https://www.tripadvisor.ca/Hotel_Review-g47533-d1176402-Reviews-Days_Inn_by_Wyndham_Long_Island_Copiague-Copiague_Long_Island_New_York.html
[58] https://www.tripadvisor.com/Hotel_Review-g34443-d87080-Reviews-Days_Inn_by_Wyndham_Miami_Airport_North-Miami_Springs_Florida.html

25

(prostitutes and drug abusers) that use ur facility i will never consider ur hotel again!"[59]

- April 2013 review of a Days Inn in Alexandria, VA states "…Everything is true about the drug activity, prostitutes, across the street is section 8 housing with loud music and lots of "traffic" to one house in particular…Safety is definitely a concern.. I parked my car one night after partying in DC and a bum knocked on my window asking for change. The police have come a few nights driving through the area asking is everything okay. One officer referred to the area as the "problem area"."[60] A guest relations manager responded to this review on April 7, 2013.

- May 2013 review of a Days Inn in Kent, WA states "…During this wait is when we witnessed the worrying stuff. We got the impression that most of the other motel guests lived there. There were guests in and out asking the desk if they had messages who either looked really disheveled or like a prostitute. Some of them knew each other. There was one woman checking in. The employee at the counter told her that if she had any "guests" she would be asked to leave..clearly there was a history. I wrote all this off to my imagination..until a police officer came in. He talked to the staff about their ongoing problems with prostitution and drugs and was offering his help and advice..the staff told him about the people living in their van and car in the parking lot. There were three police cruisers in the parking lot for awhile after that."[61]

- July 2013 review of a Days Inn in Louisville, KY states "I could not believe how bad this place was. The room was nasty, I was afraid to put my 8 month old down! The tub was stained and there were "hairs" in the tub. Not only was the room bad but so was the area..we had prostitutes working from the sidewalk outside our door! We checked out and went to another hotel down the road."[62] The hotel manager responded to this review on July 12, 2013.

- July 2013 review from Days Inn in Corpus Christi, TX states "…I honestly felt that some sort of prostitution was taking place on premises. I can think of no other explanation for the constant activity between midnight and 5:00 a.m. No iron in the room. Hallways smelled like the place had been in a flood. after the first night my son's legs boke out in a rash. The worst hotel experience ive ever had. Definitely not worth $476."[63]

---

[59]

[60] https://www.tripadvisor.co/Hotel_Review-g30226-d83887-Reviews-Days_Inn_by_Wyndham_Alexandria-Alexandria_Virginia.html

[61] https://www.tripadvisor.com/Hotel_Review-g58537-d216846-Reviews-Quality_Inn_Kent-Kent_Washington.html

[62] https://www.tripadvisor.com/Hotel_Review-g39604-d295278-Reviews-Days_Inn_by_Wyndham_Louisville_Airport_Fair_and_Expo_Center-Louisville_Kentucky.html

[63] https://www.expedia.com/Corpus-Christi-Hotels-Days-Inn-Suites-By-Wyndham-Corpus-Christi-Central.h43249.Hotel-Reviews

26

- September 2013 review from a Days Inn in Dallas, TX states "…The hotel is used mainly by prostitutes and drug dealers. It was a last minute decision on my part, due to a change in my work plans. At least I didn't find bed bugs... Wifi only worked in the lobby, false advertising on the hotel's part.... Employees there (front desk clerk and housekeeping) were very unfriendly and not helpful. overall, the worst experience with a hotel, ever. I'm upset that I paid for such crappy service and room."[64] A guest relations manager responded to this review on September 24, 2013.

- January 2014 review from a Days Inn in Beaumont, TX states "Let's see, moldy smell in room? Check. Mildew around tub? Check. Hastily painted over black mold on the wall? Check. Look on my wife's face when a hooker knocks on the door at 2 AM.? Priceless!"[65]

- February 2014 review from a Days Inn in Saint Paul, MN states "…However, when my companions and myself (three women total) went down to the bar for a drink we were propositioned.I had security remove this man. But within a short period of time he was back again harssing us. I did find out from a family member whom we were visitng that this hotel was busted for a prostitution ring. Well, that was not on the description of the hotel that I read! Had I known this we would have stayed elsewhere."[66]

- April 2014 review of a Days Inn in North Charleston, SC states "…We will NEVER stay here again. The first two nights the people next door argued and yelled half the night. Think a hooker and her pimp because people kept coming in and out all night, ridiculous."[67]

- May 2014 review of a Days Inn in Lanham, MD states "This hotel seems highly trafficked by young adults and/or those using said hotel rooms for sex/prostitution purposes. There was also a lot of screaming and cursing amongst the guests staying at hotel, with very little intervention from night staff."[68]

- July 2014 review of a Days Inn in Columbia, SC states "This place is a dump!! Not a safe place to stay with your family. Hooker's walking around,

---

[64] https://www.tripadvisor.co.nz/Hotel_Review-g55711-d109479-r368180294-Days_Inn_Suites_by_Wyndham_Dallas-Dallas_Texas.html
[65] https://www.yelp.com/biz/days-inn-by-wyndham-beaumont-beaumont
[66] https://www.expedia.com/Minneapolis-St-Paul-Hotels-Quality-Inn-St-Paul-Minneapolis-Midway.h20646.Hotel-Reviews
[67] https://www.expedia.com/Charleston-Hotels-Days-Inn-Suites-By-Wyndham-Charleston-Airport-West.h11774.Hotel-Reviews
[68] https://www.tripadvisor.com/Hotel_Review-g41222-d217008-Reviews-Days_Inn_by_Wyndham_Lanham_Washington_D_C-Lanham_Maryland.html

high speed chase, and drug dealing in front of my room!!! Do Not waste your money!!!"[69]

- July 2014 review of a Days Inn in Savannah, GA states "…Friday night I get woke up by drunk guest in the court yard. 1 am . I go to get something from the car there is 2 prostitutes offering sex for money in the drive way to a group of men getting drunk in the driveway. I decide to get stuff from the vending machines, I couldn't buy a candy bar but you could by condoms…"[70]

- September 2014 review of a Days Inn in Springfield, MO states "Worse hotel ever the room smelt like dirty feet, drug deal in the parking lot. A hooker trying to get my son to come to her room people knocking at your door all hours of the night. Then they took an $101 for charges and told me the room smelt like cigarettes.I dont smoke. So now I'm fighting with corporate office to get back my $101."[71] The hotel manager responded to this review on October 20, 2014.

71.    This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (A.N.S.) was trafficked at the subject Wyndham properties, the Wyndham Defendants knew or should have known that:

a.    There was widespread and ongoing sex trafficking occurring at Wyndham branded properties;

b.    Sex trafficking was a brand-wide problem for Wyndham originating from management level decisions at their corporate offices in New Jersey;

c.    Wyndham franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties;

d.    Wyndham's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective; and

e.    Wyndham and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

---

[69] https://www.yelp.com/biz/days-inn-and-suites-by-wyndham-se-columbia-ft-jackson-columbia
[70] https://www.tripadvisor.com/Hotel_Review-g60814-d89795-Reviews-or660-Days_Inn_Suites_by_Wyndham_Savannah_Gateway_I_95_and_204-Savannah_Georgia.html
[71] https://www.tripadvisor.com/Hotel_Review-g44926-d243908-Reviews-Days_Inn_Suites_by_Wyndham_Springfield_on_I_44-Springfield_Missouri.html

72.     Despite the mounting evidence that sex trafficking at their properties was ongoing and growing, Wyndham Defendants and each of the Franchisee Defendants chose to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

**b. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the subject Wyndham locations.**

73.     Wyndham Defendants and Franchisee Defendants were specifically aware that sex trafficking was widespread and ongoing at each of the subject Wyndham locations.

74.     Internet reviews for the subject Wyndham locations, which upon information and belief the Wyndham and Franchisee Defendants manage and monitor, show the pervasiveness of sex trafficking before and well after Jane Doe (A.N.S.) was trafficked. For example:

- A 2013 Expedia review for the Bush River Days Inn location states: "I have never stayed in a more disgusting hotel! The sheets were dirty, there was mold on the walls and carpet, and there was a hooker soliciting door to door. She wasn't even cute!"[72]

- A 2015 Expedia review for the Bush River Days Inn location states: "The toliet would not flush doors were all bent in there were hookers and broken down vehicles in front of our door for 3 nights drugs were being delt I would not recommend for family nor to anyone else."[73]

- A 2015 Expedia review for the Bush River Days Inn Columbia location states: "The front desk was very nasty. I paid for 2 nights they said I didn't I had to pull up emails. Housekeeping refused to give us towels. We had 2 towels for 4 people. Prostitutes hanging out in parking lot."[74]

- A 2013 TripAdvisor review for the Branch Road Days Inn & Suites location states: "Sex stains on the top comforter, in plain view. Open pack of condoms in the drawer. If I didn't just get out of the hospital from having hip surgery, I would have demanded my money back andi would have left. We don't have a car, and everything is booked because of the Masters. Don't ever stay here. Sheets are so old they are see through."[75]

---

[72] https://www.expedia.com/Columbia-Hotels-Days-Inn-By-Wyndham-Columbia.h532027.Hotel-Information
[73] *Id.*
[74] *Id.*
[75] https://www.tripadvisor.com/Hotel_Review-g54494-d103152-Reviews
Days_Inn_Suites_by_Wyndham_Columbia_Airport-West_Columbia_South_Carolina.html

- A 2016 Expedia review for the Branch Road Days Inn & Suites location states: "Roach motel in a crack alley. Good place to shoot up meth and bang a lady-boy hooker."[76]

- A 2014 Yelp review for the Garners Ferry Days Inn & Suites location states: "This place is a dump!! Not a safe place to stay with your family. Hooker's walking around, high speed chase, and drug dealing in front of my room!!! Do Not waste your money!!!"[77]

- A 2016 Tripadvisor review for the Garners Ferry Days Inn & Suites location states: "Room was horribly dilapidated, furniture was broken and it smelled. Only 2 towels for 2 people and only 1/4 inch of TP on both rolls. Had to get more towels & TP from front desk. Ceiling tile in shower was falling and yellow insulation was exposed. Hair dryer & electric outlet near sink did not work. Popcorn ceiling near sink was hanging down. No proper lighting over the sink. A 12 inch section of weather stripping near glass door was hanging and molded. Had to let the hot water run 10 minutes to get hot water both in the shower and in the separate sink. Security latch on the door was bent and would not work properly. The linens had holes in them and the pillows were horrible! The foldout couch was too dilapidated to sit on. Hookers were smoking pot and turning tricks in room #400 across from ours. The pot and perfume wafted into our room because there was no stripping under the doors to prevent it. Gangs and guns were on the 5th floor and the police were called. The popcorn ceiling in the lobby was falling. Breakfast, however, was good. I've stayed here before with no problems, but it's clear no one does maintenance in this facility anymore. This was confirmed when I complained upon check-out. Should have been given a full refund. Will not stay here again! It's nasty and unsafe!!!"[78]

- A 2018 Tripadvisor review for the Garners Ferry Days Inn states: "On arrival there were multiple police in the lobby arresting a resident... There was a family in front of us paying for a $30 night with 3 different credit cards, some cash and a few gift cards... Problem was none of the cards were in his name... There was (what I assume) was a pimp behind me impatiently yelling over my head trying to get a room "for a few hours" for his girl and her friend (a 18 yr old girl and a 50+ year old man)."[79]

- A 2014 Tripadvisor review for the Plumbers Rd. Days Inn & Suites by Wyndham states: "This is quite possibly the worst hotel stay I've ever had my life. I felt more comfortable 20 years ago when I was homeless living on the street . It did have a natural appeal to it with all the bugs in the room. After a 12 hour drive the last thing I wanted to see was a filthy room. When we got there

---

[76] https://www.expedia.com/Columbia-Hotels-Days-Inn-Suites-By-Wyndham-Columbia-Airport.h17043.Hotel-Information?pwaDialogNested=PropertyDetailsReviewsBreakdownDialog
[77] https://www.yelp.com/biz/days-inn-and-suites-by-wyndham-se-columbia-ft-jackson-columbia
[78] https://www.tripadvisor.com/Hotel_Review-g54184-d103250-Reviews-Days_Inn_Suites_by_Wyndham_SE_Columbia_Ft_Jackson-Columbia_South_Carolina.html
[79] *Id.*

a refrigerator didn't work, the bathroom looked hideous, and your feet felt sticky on the carpet. The manager was helpful in replacing the refrigerator, but overall it just wasn't worth it . The outside was kept unclean . At 2 o'clock in the morning a hooker and knocked on my door and asked if I would like her service. When I told her I was with my wife and kid she said she wouldn't charge extra. People that were upstairs decided at 230 in the morning to start their wrestling match. This place was so horrible that even my dog was scared."[80]

- A 2011 Yelp review for the Plumbers Rd. Days Inn & Suites by Wyndham states: "No bugs that i could see, but the basic uncleanliness of the hotel is quite evident. Used condom in the trash can, bed cover and pillows nasty, and the couch in the room appeared as though it was picked up at the community trash dump (velvet blue/1980s). The manager(s) did not speak english and were ill-tempered and rude."[81]

- A 2017 Expedia review for the Barabara Rd Microtel Inn & Suites states: "I went to check in and someone in the parking lot asked me if I wanted to buy drugs or If I needed sex. I went inside to lobby and the same person came inside smoking in the lobby. I told the front desk about it and they said that they should be in there rooms. It was also unclean and smelly in the lobby. I refused to check in and ask to cancel my room. I was told that they will still charge me for room. This is crazy. I walked out along with another couple and we went to the other Microtel on Garners Ferry. The other couple said that they didnt feel safe. It was alot of people hanging out in lobby."[82]

- A 2017 Expedia review for the Barabara Rd Microtel Inn & Suites states: "Found what it seemed to be a lot of prostitution & smell of marijuana. Wouldn't recommend anyone staying there. Also killed some roaches in the bathroom."[83]

- A 2015 Yelp review for the Barabara Rd t Microtel Inn & Suites states: "Where to start? The second night here, there was a drive by in the parking lot. On any given night, there are several hookers and pimps working. The stream of Johns is non stop day and night. The water was dirty the first day and night and never tasted right. I stuck to bottled water. I gave two stars for the easy access to cheap sex. Lol. I would not recommend staying here. I had to because my work made me because it was inexpensive. Also the WiFi sucks."[32]

---

[80] https://www.tripadvisor.com/Hotel_Review-g54184-d97103-Reviews-Days_Inn_by_Wyndham_Columbia_NE_Fort_Jackson-Columbia_South_Carolina.html

[81] *Id.*

[82] https://www.expedia.com/Columbia-Hotels-Microtel-Inn-Suites-By-Wyndham-ColumbiaFort-Jackson-N.h116510.Hotel-Information?pwaDialogNested=PropertyDetailsReviewsBreakdownDialog

[83] *Id.*

[32] https://www.yelp.com/biz/microtel-inn-and-suites-by-wyndham-columbia-two-notch-rd-area-columbia

75.     Traffickers, including Jane Doe (A.N.S.)'s trafficker, repeatedly chose to use these subject Wyndham locations for their sex trafficking activity. As such, Wyndham Defendants and Franchisee Defendants also knew or should have known about the pervasive sex trafficking at the Wyndham locations based on obvious indicators of this activity.

76.     Jane Doe (A.N.S.) was aware of other traffickers and other sex trafficking victims at each of the subject Wyndham locations.

77.     Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the subject Wyndham locations prior to Jane Doe (A.N.S.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

78.     All knowledge from the staff at each subject Wyndham location is imputed to to the Franchisee Defendant who provided "boots on the ground" at that hotel and employed the hotel staff. Thus, each of the Franchisee Defendants knew about this widespread and ongoing trafficking at its hotel, including the trafficking of Jane Doe (A.N.S.), through the direct observations of hotel staff, including management-level staff. This knowledge is further imputed to the Wyndham Defendants based on the existence of an actual agency relationship as described below.

32

79. Upon information and belief, in addition to available public sources of information about trafficking and knowledge imputed from the hotel staff and management, each of the Franchisee Defendants learned or should have learned about the obvious signs of widespread trafficking at its hotel, based on non-public sources of information including but not limited to:

  a. surveillance of the property;

  b. internal investigations;

  c. customer complaints;

  d. monitoring of customer feedback;

  e. information received from law enforcement;

  f. and other sources of non-public information available to each Franchisee Defendant.

80. Upon information and belief, the Wyndham Defendants knew or should have known about the widespread trafficking at the subject Wyndham locations referenced herein, based on:

  a. The obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the Wyndham Defendants;

  b. The Wyndham Defendants' regular monitoring of online reviews;

  c. The Wyndham Defendants' collection and monitoring of customer surveys and complaints;

  d. The Wyndham Defendants' requirement that franchisee submit regular and detailed reports to the Wyndham Defendants about day-to-day hotel operations;

  e. The Wyndham Defendants' collection and monitoring of data about guests at the subject Wyndham locations, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

  f. The Wyndham Defendants' supervision and control over day-to-day operations of the subject Wyndham locations through detailed information and extensive reports that it obtained through the property management system and other software systems it required franchisee to use and through which franchisee was obligated

33

to allow the Wyndham Defendants to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

g.

h. The Wyndham Defendants' regular inspections of the subject Wyndham locations;

i. Information provided to the Wyndham Defendants by law enforcement;

j. The Wyndham Defendants' access to surveillance and security systems; and

k. Other sources of information available to the Wyndham Defendants.

81. The Wyndham Defendants required hotel staff, management, and franchisees to report suspected criminal activity at the subject Wyndham locations, including suspected sex trafficking, to the Wyndham Defendants.

82. Based on the obvious "red flags" of sex trafficking at the subject Wyndham locations, Franchisee Defendants and the staff and management of the subject Wyndham locations were required to, and upon information and belief did, report numerous instances of suspected sex trafficking to the Wyndham Brand Defendants before and during Jane Doe (A.N.S.)'s trafficking.

83. Upon information and belief, before and during Jane Doe (A.N.S.)'s trafficking, the Wyndham Defendants observed obvious "red flags" of numerous instances of sex trafficking occurring at the subject Wyndham locations based on their supervision and monitoring of those hotels.

c. **Defendants knew Jane Doe (A.N.S.) was being trafficked at these subject Wyndham locations because of the apparent and obvious "red flags" of sex trafficking.**

84. During the period that Jane Doe (A.N.S.) was trafficked at the subject Wyndham locations, there were obvious signs of the activity associated with her trafficking. Throughout this period, Jane Doe (A.N.S.) was under the control of the same trafficker. This trafficker used a consistent *modus operandi* while trafficking Jane Doe (A.N.S.) and other victims. This trafficker imposed strict rules on Jane Doe (A.N.S.) and other victims and followed patterns consistent with how sex traffickers typically operate in hotels. Thus, the trafficking activity at each of the subject

34

Wyndham locations resulted in obvious and recurring signs that matched "red flags" of sex trafficking recognized by the hotel industry and each of the Defendants.

85.     Obvious "red flags" of sex trafficking that manifested at each  of the subject Wyndham locations while Jane Doe (A.N.S.) was trafficked at these hotels include:

a.  The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards;

b.  Other girls were trafficked at the same hotel at the same time as Jane Doe (A.N.S.), including another minor victim of her trafficker;

c.  Jane Doe (A.N.S.) would arrive at the hotel, for an extended stay, without luggage and with few personal possessions;

d.  Even though Jane Doe (A.N.S.) and her traffickers would stay for multiple days or weeks at a time, housekeeping was kept away by using the "Do Not Disturb" door hanger;

e.  Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange and other standard room services;

f.  The trafficker or his associates were often present with Jane Doe (A.N.S.) at check in and would linger around the hotel or in the parking lot while she was with a john. It was obvious to hotel staff that her trafficker was monitoring her activity;

g.  Her trafficker would go to Jane Doe (A.N.S.)'s room throughout the day to collect money or would require Jane Doe (A.N.S.) to bring the money collected down to the parking lot;

h.  Jane Doe (A.N.S.) was a teenager and her trafficker was a much older man. They were often with other young women;

i.  Her trafficker required her to dress in revealing clothing, including lingerie;

j.  Her trafficker restricted her ability to move freely around the hotel;

k.  Her appearance showed obvious signs of the abuse she was enduring, including obvious signs of sleep deprivation, and a nervous and fearful demeanor;

l.  The trafficker often spoke to hotel staff regarding accommodations for the johns and the amount of johns that were coming in and out of the rooms;

m.  There was heavy foot traffic in and out of Jane Doe (A.N.S.)'s room involving men who were not hotel guests;

35

n.  Jane Doe (A.N.S.) had at least ten (10) johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time; and

o.  Other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel.

86.  Based upon information and belief, multiple employees at each of the subject Wyndham locations named herein, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

87.  In addition to these signs that were present at all the subject Wyndham locations, at the Bush River Days Inn, the volume of trafficking was particularly high and Jane Doe (A.N.S.) would see as many as 26 or more johns in a single day.  Her trafficker would regularly interact with the hotel staff and would pay for the rooms daily with cash. Even when they stayed at this hotel for extended periods, Jane Doe (A.N.S.)'s trafficker would not allow housekeeping to enter and arranged with hotel staff that Jane Doe (A.N.S.) would clean the room.

88.  At the Branch Road Days Inn, Jane Doe (A.N.S.) was trafficked while she was still a minor. The hotel staff had a reasonable opportunity to observe her, including when she was in the presence of her trafficker. Her trafficker would regularly interact with the hotel staff and would pay for the rooms daily with cash. The revealing clothing that her trafficker required her to wear at this hotel was so noticeable that a guest approached her in the lobby area to comment on her attire.

89.  At the Garners Ferry Days Inn, Jane Doe (A.N.S.) was trafficked while she was still a minor. The hotel staff had a reasonable opportunity to observe her., including when she was in the presence of her trafficker. Although they stayed at this hotel for an extended period, Jane Doe (A.N.S.)'s trafficker forbid housekeeping from entering the room and required Jane Doe (A.N.S.)

36

to clean the room. Her trafficker would regularly interact with the hotel staff and would pay for the rooms daily with cash.

90.    At the Plumbers Rd Days Inn, Jane Doe (A.N.S.) was trafficked while she was still a minor. The hotel staff had a reasonable opportunity to observe her, including when she was in the presence of her trafficker. Her trafficker would regularly interact with the hotel staff and would pay for the rooms daily with cash.

91.    At the Barbara Rd Microtel Inn, the "red flags" of trafficking were so obvious that hotel staff discussed them with Jane Doe (A.N.S.)'s traffickers. As a result of this conversation, the trafficking activity was allowed to continue but it was arranged that johns would enter through a rear door rather than through the lobby. Her trafficker would regularly interact with the hotel staff and would pay for the rooms daily with cash. The presence of sex trafficking was so well known at the Barbara Rd Microtell Inn that law enforcement conducted a sting operation while Jane Doe (A.N.S.) was at this hotel.

92.    Based on the "red flags" that the hotel staff observed during Jane Doe (A.N.S.)'s trafficking at each of the subject Wyndham locations, each of the Franchisee Defendants knew or was willfully blind to the fact that Jane Doe (A.N.S.) was being trafficked at the subject Wyndham locations.

93.    Given these obvious signs, Wyndham Defendants knew or should have known about the trafficking of Jane Doe (A.N.S.) based on its policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

94.    The Wyndham Defendants also knew or should have known about the trafficking of Jane Doe (A.N.S.) based on the numerous tools, described above, through which they monitored and supervised the subject Wyndham locations. The "red flags" of Jane Doe (A.N.S.)'s trafficking

37

at these hotels were sufficiently obvious that they were readily detectable through the oversight tools that the Wyndham Defendant used.

95.     The Wyndham Defendants also had constructive knowledge of the activity that resulted in the trafficking of Jane Doe (A.N.S.) at subject Wyndham locations because that activity was accompanied by such recognized "red flags" of sex trafficking that it was readily detectable through the exercise of ordinary diligence. If the Wyndham Defendants had exercised ordinary prudence in areas of operations over which they retained control or in which they directly participated, they would have detected and stopped benefiting from the illegal activities of Jane Doe (A.N.S.)'s traffickers at the subject Wyndham locations.

IV.     **Defendants actively facilitated sex trafficking at these subject Wyndham locations, including the trafficking of Jane Doe (A.N.S.).**

a.     **Franchisee Defendants facilitated the trafficking of Jane Doe (A.N.S.).**

96.     Each of the Franchisee Defendants is responsible for the acts, omissions, and knowledge of all employees at its respective subject Wyndham location when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Franchisee Defendants ratified these acts and omissions, and because Franchisee Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisee Defendants, of sex trafficking occurring at the subject Wyndham locations.

97.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at its respective subject Wyndham location, each of the Franchisee Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

98.     Each Franchisee Defendants knew or was willfully blind to the fact that Jane Doe (A.N.S.) was being trafficked and, despite this, benefited from continued association with her

38

traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (A.N.S.)'s sexual exploitation.

99.     Throughout 2016, Naniatma maintained a business relationship with Jane Doe (A.N.S.)'s trafficker, renting hotel rooms to him on multiple occasions. Naniatma repeatedly interacted with Jane Doe (A.N.S.)'s trafficker and renewed this business relationship as the trafficker repeatedly brought Jane Doe (A.N.S.) to the Bush River Days Inn for two or three weeks at a time but paid for the room in cash on a daily basis. Naniatma developed a familiar relationship with Jane Doe (A.N.S.)'s trafficker and repeatedly turned a blind eye to the obvious signs of his illegal activities, accommodated his requests, and created an environment where he could operate efficiently and with minimal risk of disruption or interference. This facilitated the trafficking of Jane Doe (A.N.S.) and prompted Jane Doe (A.N.S.)'s trafficker to repeatedly return to this hotel.

100.     For a period of several weeks in 2014, RJR maintained a business relationship with Jane Doe (A.N.S.)'s trafficker. Despite the obvious "red flags" associated with the trafficker's illegal activity, RJR continued to renew the business relationship by renting him rooms at the Branch Road Days Inn, which he used to traffic and exploit Jane Doe (A.N.S.). During this period of several weeks, hotel staff regularly observed and interacted with Jane Doe (A.N.S.)'s trafficker. RJR developed a familiar relationship with Jane Doe (A.N.S.)'s trafficker and repeatedly turned a blind eye to the obvious signs of his illegal activities, accommodated his requests, and created an environment where he could operate efficiently and with minimal risk of disruption or interference. This facilitated the trafficking of Jane Doe (A.N.S.) and caused her trafficker to continue operating at this hotel.

101.     Over a period of approximately 18 months, AMBE MAA maintained a business relationship with Jane Doe (A.N.S.)'s trafficker. Despite observing obvious "red flags" of sex

39

trafficking, AMBE MAA continued to generate revenue by renewing the business relationship and renting rooms at the Plumber Rd Days Inn to Jane Doe (A.N.S.)'s trafficker for multiple stays over this period. During these stays, hotel staff regularly interacted with Jane Doe (A.N.S.)'s trafficker. AMBE MAA developed a familiar relationship with Jane Doe (A.N.S.)'s trafficker and repeatedly turned a blind eye to the obvious signs of his illegal activities, accommodated his requests, and created an environment where he could operate efficiently and with minimal risk of disruption or interference. This facilitated the trafficking of Jane Doe (A.N.S.) and prompted Jane Doe (A.N.S.)'s trafficker to repeatedly return to this hotel.

102. While Jane Doe (A.N.S.)'s trafficker kept her at the Garners Ferry Days Inn for weeks, GITA created a continuous business relationship with Jane Doe (A.N.S.)'s trafficker by continuing to rent him rooms at the despite the obvious "red flags" of his sex trafficking activity. Hotel staff regularly observed and interacted with Jane Doe (A.N.S.)'s trafficker. GITA and its hotel staff turned a blind eye to the trafficker's illegal activities, accommodated his requests, and created an environment where he could operate efficiently and with minimal risk of disruption or interference. This facilitated the trafficking of Jane Doe (A.N.S.) and caused her trafficker to continue operating at this hotel.

103. Over a period of approximately 5 months, Shree Rama maintained a business relationship with Jane Doe (A.N.S.)'s trafficker. Despite the obvious "red flags" of the trafficker's illegal activities, Shree Rama continued to rent this trafficker rooms at the Barbara Dr Microtell Inn for months. During this stay, hotel staff regularly interacted with Jane Doe (A.N.S.)'s trafficker. The signs of the trafficking activity were sufficiently obvious and disruptive that the hotel staff talked to Jane Doe (A.N.S.)'s trafficker. However, the outcome of this conversation was an understanding that "johns" would use a door in the rear, while the trafficking activity continued.

40

Shree Rama and its hotel staff turned a blind eye to the trafficker's illegal activities, accommodated his requests, and created an environment where he could operate efficiently and with minimal risk of disruption or interference. This facilitated the trafficking of Jane Doe (A.N.S.) and caused her trafficker to continue operating at this hotel.

104.    Each of the Franchisee Defendants also facilitated widespread trafficking at their respective subject Wyndham location, including the trafficking of Jane Doe (A.N.S.), in ways including:

   a.  allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

   b.  developing relationships with traffickers, including (A.N.S.)'s trafficker, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

   c.  continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of (A.N.S.) and other victims;

   d.  failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

   e.  accommodating specific requests made by traffickers;

   f.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

   **b.  Wyndham Defendants facilitated the trafficking of Jane Doe (A.N.S.).**

105.    Wyndham Defendants are responsible for the acts, omissions, and knowledge of all employees of the subject Wyndham locations when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Wyndham Defendants ratified these acts and omissions, and because Wyndham Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks,

41

known to Wyndham Defendants, of sex trafficking occurring at these Wyndham branded locations including the subject locations.

106.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Wyndham locations, Wyndham Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

107.    Upon information and belief, the Wyndham Defendants participated directly in aspects of the operation of the subject Wyndham locations that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Jane Doe (A.N.S.), as follows:

    a.    The Wyndham Defendants have publicly assumed responsibility and control over the human trafficking response of all Wyndham properties, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy;

    b.    The Wyndham Defendants retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in Wyndham branded hotels;

    c.    The Wyndham Defendants retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the Wyndham Defendants. The Wyndham Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement;

    d.    The Wyndham Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity;

    e.    The Wyndham Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

    f.    The Wyndham Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The Wyndham Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

42

g. Although they delayed making any reasonable effort to do so, the Wyndham Defendants acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity;

h. The Wyndham Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Wyndham properties, including suspected trafficking incidents;

i. The Wyndham Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the subject Wyndham locations;

j. The Wyndham Defendants maintained control over all details of the terms under which franchised hotels, including the subject Wyndham locations, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The Wyndham Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the subject Wyndham locations;

k. The Wyndham Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the subject Wyndham locations, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

l. The Wyndham Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the subject Wyndham locations, including trends that would reveal patterns consistent with human trafficking.

108. Wyndham directly participated in and retained day-to-day control over renting rooms at the subject Wyndham locations by, among other things:

a. The Wyndham Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b. The Wyndham Defendants directly made reservations for rooms at the subject Wyndham locations and accepted payment for those rooms through a central reservation system that they controlled and operated. The Wyndham Defendants could reserve rooms and accept payments without requiring franchisee approval or involvement;

43

c. The Wyndham Defendants established and maintained control over a brand-wide "do not rent" system. The Wyndham Defendants set all policies related to use of this system and dictated the day-to-day details of reservations at the subject Wyndham locations through detailed policies that it established regarding use of this "do not rent" system;

d. The Wyndham Defendants controlled room rates, required discounts, mandatory fees, and rewards program;

e. The Wyndham Defendants controlled and restricted the ability of franchisee and staff to refuse or cancel a reservation;

f. The Wyndham Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

g. The Wyndham Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the subject Wyndham locations;

h. The Wyndham Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the subject Wyndham locations until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

i. The Wyndham Defendants required franchisees to use Wyndham's property management system, which was owned, maintained, controlled, and operated by the Wyndham Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

109. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Wyndham locations named herein, Wyndham continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (A.N.S.).

110. Wyndham knew or should have known that Jane Doe (A.N.S.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe (A.N.S.)'s sexual exploitation.

111. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the subject Wyndham locations, the Wyndham Defendants continued

44

participating in a venture at these hotels, with its franchisees and hotel staff, in a way that it knew

or should have known would lead to additional sex trafficking at the hotels, including but not

limited to by the following:

a. The Wyndham Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking;

b. The Wyndham Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

c. The Wyndham Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Wyndham properties;

d. The Wyndham Defendants implicitly approved decisions by franchisees and hotel staff not to report or respond to criminal activity including sex trafficking appropriately;

e. The Wyndham Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the subject Wyndham locations;

f. The Wyndham Defendants attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal;

g. Despite having specific knowledge of policies that would significantly reduce sex trafficking at its branded locations including the subject Wyndham locations, the Wyndham Defendants declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or that would require publicly acknowledging the ongoing problem of sex trafficking at its properties;

h. The Wyndham Defendants willfully delayed taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner;

i. The Wyndham Defendants allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability; and

j. The Wyndham Defendants provided traffickers with access to internet services in a manner that the Wyndham Defendants knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

112. If Wyndham had exercised reasonable diligence when operating their Wyndham

properties and in the areas where it retained control, Wyndham would have prevented the subject

45

Wyndham locations from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (A.N.S.). Instead, Wyndham engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (A.N.S.).

V.    **Defendants' Ventures at Days Inn, Days Inn & Suites, Days Inn & Suites by Wyndham, and Microtel Inn & Suites properties.**

113.    Each of the Wyndham Defendants generated substantial income from the subject Wyndham locations, receiving a share of the profits from room rentals collected at the hotel. The fees generated by the Wyndham Defendants were primarily based on gross room rentals; therefore, the Wyndham Defendants' profits increased with each room rental at the subject Wyndham locations, including each room rented to a trafficker. Revenue generated from rooms rented at the subject Wyndham locations was distributed among the Wyndham Defendants, with each benefiting from each rental of a hotel room to a trafficker, including Jane Doe (A.N.S.)'s trafficker.

114.    Each Franchisee Defendant profited from every room rented to a trafficker or for use in trafficking at its respective subject Wyndham location, both from the room fee and from fees for other hotel services.

115.    In ways described more fully above, the Wyndham Defendants and Franchisee Defendants knowingly received a financial benefit from participating in a venture in the form of a continuous business relationship and implicit understanding with the traffickers operating out of subject Wyndham locations, including Jane Doe (A.N.S.)'s trafficker. (hereinafter "Venture 1").

116.    The Wyndham Defendants and each Franchisee Defendant formed this continuous business relationship and implicit understanding with the traffickers at the subject Wyndham locations by continuing to rent rooms to be used for trafficking (including Jane Doe (A.N.S.)'s

46

trafficking) after the Wyndham Defendants and each Franchisee Defendant knew or should have known that the rooms were being used for unlawful trafficking.

117.    This business relationship involved mutual pursuant of financial benefit: the traffickers were renting the hotel rooms to generate revenue from sex trafficking and the Wyndham Defendants and Franchisee Defendants were generating revenue by renting the hotel rooms.

118.    This implicit understanding developed because sex traffickers, including Jane Doe (A.N.S.)'s trafficker, frequently used the subject Wyndham locations for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the Wyndham Defendants and Franchisee Defendants that created a favorable environment for sex trafficking to flourish. Multiple traffickers operated at each of these hotels, and multiple victims were harbored, provided, and exploited at each of these hotels.

119.    Both the Wyndham Defendants and each of the Franchisee Defendants participated in this venture by acting jointly to rent rooms to traffickers and to operate these hotels in a way that attracted business from traffickers and facilitated their trafficking activity. As further described above, each Franchisee Defendant provided "boots on the ground" at its respective hotel, and the Wyndham Defendants played a primary role in renting rooms at each of the subject Wyndham locations and retained control over and was directly involved in aspects of hotel operations related to sex trafficking.

120.    The Wyndham Defendants and each Franchisee Defendant participated in the venture by continually renting rooms to traffickers, including Jane Doe (A.N.S.)'s, after they knew or should have known that victims like Jane Doe (A.N.S.) were being subjected to unlawful trafficking. They also continued operating the hotel in a way that they knew or should have known

would encourage traffickers to select the subject Wyndham locations as a venue for their illegal activities.

121.    Wyndham Defendants and Franchisee Defendant did not only provide these traffickers with a physical space (harboring) where they could imprison victims and sell them "johns" (providing), but they also provided these traffickers with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with traffickers, which is evidenced by, among other things:

    a.   The traffickers, including Jane Doe (A.N.S.)'s, were familiar to the staff at each of the subject Wyndham locations;

    b.   These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from the staff at the subject Wyndham locations but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by the staff;

    c.   Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

    d.   Defendants provided additional services to traffickers (including Jane Doe (A.N.S.)'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

122.    The criminal traffickers operating at the subject Wyndham locations as part of Venture 1 violated 18 U.S.C. §1591 as to victims including Jane Doe (A.N.S.)

123.    If Wyndham Defendants and Franchisee Defendant had not continued participating in a venture that they knew or should have known engaged in violations of the TVPRA, they would not have received a benefit from (A.N.S.)'s trafficking at subject Wyndham locations.

124.    In ways described more fully above, the Wyndham Defendants and Franchisee Defendants also knowingly received a financial benefit from participating in a commercial hotel-operating venture at their respective subject Wyndham locations (hereinafter "Venture 2").

125. The Wyndham Defendants had a longstanding business relationship with each of the Franchisee Defendants pursuant to which they jointly participated in operation of their respective subject Wyndham locations with a shared goal of maximizing revenue, including gross room revenue.

126. The Wyndham Defendants and Franchisee Defendants, through their respective roles in hotel operations as described above, facilitated widespread sex trafficking at the subject Wyndham locations by continuing to operate the hotels in a way that they knew or should have known resulted in them benefiting from significant sex trafficking occurring on site at this hotel.

127. Venture 2 was engaged in a violation of the TVRPA through the widespread sex trafficking at each of the subject Wyndham locations, which resulted in Jane Doe (A.N.S.) and other victims being harbored, maintained, and provided in the rooms of the subject Wyndham locations. Venture 2 also engaged in a violation of the TVPRA through the actions of each of the Franchisee Defendants who violated the TVPRA as perpetrators by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

128. Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Wyndham Defendants and Franchisee Defendants participated in the venture by continuing to operate the subject Wyndham locations in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of Jane Doe (A.N.S.). The Wyndham Defendants provided Franchisee Defendants with operational support, use of trademarks, marketing services, and other resources to operate the subject Wyndham locations in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).

**VI.    Franchisee Defendants and the Staff at the Days Inn, Days Inn & Suites, Days Inn & Suites by Wyndham, and Microtel Inn & Suites Locations Named Herein Acted as Actual Agents of Wyndham.**

129.    Wyndham is vicariously liable for the acts, omissions, and knowledge of Franchisees and staff at the subject Days Inn, Days Inn & Suites, Days Inn & Suites by Wyndham, and Microtel Inn & Suites locations named herein, which are Wyndham's actual agents or subagents.

130.    The Wyndham Defendants subjected Franchisee Defendants to detailed standards and requirements regarding the operation of the Days Inn, Days Inn & Suites, Days Inn & Suites by Wyndham, and Microtel Inn & Suites locations named herein through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Defendants.

131.    The Wyndham Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the Wyndham Defendants imposed on the franchisees:

    a.   did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendants used at the subject Days Inn, Days Inn & Suites, Days Inn & Suites by Wyndham, and Microtel Inn & Suites locations;

    b.   covered virtually all aspects of hotel operations, including internal operating functions;

    c.   dictated the specific manner in which Franchisee Defendants and hotel staff must carry out most day-to-day functions at the subject Days Inn, Days Inn & Suites, Days Inn & Suites by Wyndham, and Microtel Inn & Suites locations; and

    d.   significantly exceeded what was necessary for Wyndham to protect its registered trademarks.

132.    In addition to the ways described above, upon information and belief, Wyndham exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendants' day-to-day operation of the subject Days Inn, Days Inn & Suites, Days Inn & Suites by Wyndham, and Microtel Inn & Suites locations named herein, including the following ways:

a.    The Wyndham Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Wyndham Defendants to protect their registered trademarks;

b.    The Wyndham Defendants provided training for hotel management and select hotel staff on-site at the Days Inn, Days Inn & Suites, Days Inn & Suites by Wyndham, and Microtel Inn & Suites and at locations selected by the Wyndham Defendants;

c.    The Wyndham Defendants required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

d.    The Wyndham Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e.    The Wyndham Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f.    For certain products and services that franchisees were required to purchase to operate the subject Days Inn, Days Inn & Suites, Days Inn & Suites by Wyndham, and Microtel Inn & Suites locations named herein, the Wyndham Defendants designated approved vendors and prohibited franchisees from purchasing goods and services from anyone other than an approved vendor;

g.    The Wyndham Defendants required franchisees to sign a technology agreement governing the terms under which franchisees must procure and use technical services and software while operating the subject Days Inn, Days Inn & Suites, Days Inn & Suites by Wyndham, and Microtel Inn & Suites locations named herein. Franchisees were required to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel;

h.    The Wyndham Defendants set required staffing levels for the subject Days Inn, Days Inn & Suites, Days Inn & Suites by Wyndham, and Microtel Inn & Suites locations named herein;

i.    The Wyndham Defendants established detailed job descriptions for all positions in Days Inn, Days Inn & Suites, Days Inn & Suites by Wyndham, and Microtel Inn &

51

Suites properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j.  The Wyndham Defendants set requirements for the hiring process used by franchisees and oversaw employee discipline processes and termination decisions;

k.  The Wyndham Defendants provided benefits for employees of franchised hotels;

l.  The Wyndham Defendants required Defendant Franchisees to use a customer resource management program maintained and operated by the Wyndham Defendants;

m.  The Wyndham Defendants controlled channels for guests to report complaints or provide feedback regarding the subject Days Inn, Days Inn & Suites, Days Inn & Suites by Wyndham, and Microtel Inn & Suites locations and directly participated in the response and/or supervised the response to customer complaints or other feedback. The Wyndham Defendants retained the right to provide refunds or other compensation to guests and to require Defendant Franchisees to pay associated costs;

n.  The Wyndham Defendants generated reports and analysis of guest complaints and online reviews for the subject Days Inn, Days Inn & Suites, Days Inn & Suites by Wyndham, and Microtel Inn & Suites locations;

o.  The Wyndham Defendants required Defendant Franchisees to use a Guest Relations Application owned, operated, and maintained by the Wyndham Defendants to manage all guest data and information. The Wyndham Defendants could use the backend of this system to analyze data and generate reports;

p.  The Wyndham Defendants set detailed requirements for insurance that franchisees must purchase and retain the right to purchase insurance for franchisees and to bill franchisees directly for that insurance if the Wyndham Defendants determined that the franchisees have not purchased adequate insurance;

q.  The Wyndham Defendants regularly audited the books and records of Defendant Franchisees;

r.  The Wyndham Defendants conducted frequent and unscheduled inspections of Days Inn, Days Inn & Suites, Days Inn & Suites by Wyndham, and Microtel Inn & Suites properties, including the subject Days Inn, Days Inn & Suites, Days Inn & Suites by Wyndham, and Microtel Inn & Suites locations named herein;

s.  The Wyndham Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreements if franchisees violated any of the Wyndham Defendants' detailed rules, expectations, protocols, or policies, including those that governed day-to-day

52

operations of the subject Days Inn, Days Inn & Suites, Days Inn & Suites by Wyndham, and Microtel Inn & Suites location named herein;

t. The Wyndham Defendants controlled all marketing for the subject Days Inn, Days Inn & Suites, Days Inn & Suites by Wyndham, and Microtel Inn & Suites 8 locations and prohibited franchisees from maintaining any online presence unless specifically reviewed and approved by the Wyndham Defendants;

u. The Wyndham Defendants imposed detailed recordkeeping and reporting requirements on Defendant Franchisees regarding virtually all aspects of hotel operations;

v. The Wyndham Defendants supervised and controlled day-to-day operations of the subject Days Inn, Days Inn & Suites, Days Inn & Suites by Wyndham, and Microtel Inn & Suites locations named herein through detailed information and extensive reports that it obtained through the property management system and other software systems it required Defendant Franchisees to use; and

w. The Wyndham Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

**VII.    Defendants are Jointly and Severally Liable for Jane Doe (A.N.S.)'s Damages.**

133.    The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (A.N.S.).

134.    Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (A.N.S.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

<u>**CAUSE OF ACTION—SEX TRAFFICKING UNDER THE TVPRA**</u>

135.    Jane Doe (A.N.S.)  incorporates all previous allegations.

**I.    Count 1: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Franchisee Defendants).**

136.    Jane Doe (A.N.S.) is a victim of sex trafficking within the meaning of §1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

53

137.    Each Franchisee Defendant is a perpetrator within the meaning of 18 U.S.C §1595(a) because each Franchisee Defendant:

    a.  violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals (including Jane Doe (A.N.S.) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property; and

    b.  violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel properties.

138.    Violations of 18 U.S.C §1595(a) by each of the Franchisee Defendants as "perpetrators" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (A.N.S.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

**II.  Count 2: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).**

139.    Jane Doe (A.N.S.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

140.    Through acts and omissions described throughout this Complaint, Wyndham Defendants and each Franchisee Defendant received a financial benefit from participating in a venture with traffickers, including Jane Doe (A.N.S.)'s traffickers, despite the fact that each defendant knew or should have known that these traffickers, including Jane Doe (A.N.S.)'s traffickers, were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus,

54

the Wyndham Defendants and each Franchisee Defendant are liable as a beneficiary under 18 U.S.C §1595(a).

141.    Through the acts and omissions described throughout this Complaint, Wyndham Defendants and each Franchisee Defendant received a financial benefit from participating in a hotel-operating venture regarding the operations of its respective hotel even though Wyndham Defendants and each Franchisee Defendant  knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

142.    Violations of 18 U.S.C §1595(a) by Wyndham Defendants and each Franchisee Defendant as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (A.N.S.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

### III.    Count 3: Liability under 18 U.S.C. § 2255

143.    While a minor, Plaintiff was a victim under 18 U.S.C. §1591 and is thus entitled to bring a civil action under 18 U.S.C. § 2255.

144.    Each Franchisee Defendant is liable to Plaintiff under 18 U.S.C. § 2255 because, as alleged above, each Franchisee Defendant is a perpetrator under 18 U.S.C. §1591.

145.    The Wyndham Defendants and each Franchisee Defendant are liable to Plaintiff under 18 U.S.C. § 2255 because, as alleged above, the Wyndham Defendants and each Franchisee Defendant is liable as a beneficiary under 18 U.S.C. §1595(a).

### IV.    Count 4: Vicarious Liability for TVPRA Violations.

146.    Franchisee Defendants acted as the actual agent of Wyndham Defendants when operating its respective hotel property.

55

147.    Through the acts and omissions described throughout this Complaint, Wyndham Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by each Franchisee Defendant to operate its respective hotel property.

148.    Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agents and its subagents.

149.    Wyndham Defendants are vicariously liable for the TVPRA violations of its franchisees and the subagents of that franchisee.

150.    As alleged above, each Franchisee Defendant is directly liable to Jane Doe (A.N.S.) for violations of the TVPRA, both as a perpetrator under 18 U.S.C §1591(a) and as a beneficiary under 18 U.S.C §1595(a). Each Franchisee Defendant is also directly liable to Jane Doe (A.N.S.) under § 2255. Wyndham is vicariously liable to Jane Doe (A.N.S.) for those same violations.

## DAMAGES

151.    Wyndham and Franchisee Defendants' acts and omissions, individually and collectively, caused Jane Doe (A.N.S.) to sustain legal damages.

152.    Wyndham and Franchisee Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (A.N.S.).

153.    Jane Doe (A.N.S.) is entitled to be compensated for personal injuries and economic damages, including:

    a.  Actual damages (until trial and in the future);

    b.  Incidental and consequential damages (until trial and in the future);

    c.  Mental anguish and emotional distress damages (until trial and in the future);

    d.  Lost earnings and lost earning capacity (until trial and in the future);

    e.  Necessary medical expenses (until trial and in the future);

56

f.   Life care expenses (until trial and in the future);

g.   Physical pain and suffering (until trial and in the future);

h.   Physical impairment (until trial and in the future);

i.   Exemplary/Punitive damages;

j.   Attorneys' fees;

k.   Costs of this action; and

l.   Pre-judgment and all other interest recoverable.

## JURY TRIAL

154.   Jane Doe (A.N.S.) demands a jury trial on all issues.

## RELIEF SOUGHT

155.   WHEREFORE, Jane Doe (A.N.S.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (A.N.S.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (A.N.S.) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

**THE LOCKS LAW FIRM**

*/s/ Francesca A. Iacovangelo*
Francesca A. Iacovangelo, Esq.
601 Walnut Street, Suite 720 E
Philadelphia, PA 19106
(215) 893-3454
(215) 893-3444 Facsimile
fiacovangelo@lockslaw.com

**ATTORNEYS FOR PLAINTIFF**

57